Case No. 10-1725

IN THE UNITED STATES COURT OF APPEALS

FOR THE EIGHTH CIRCUIT
_____

GERALD A. FAST, TALISHA CHESHIRE, AND BRADY GEHRLING,

Plaintiffs - Appellees

v.

APPLEBEE'S INTERNATIONAL, INC.,

Defendant - Appellant

_____

ON INTERLOCUTORY APPEAL FROM THE UNITED STATES DISTRICT
COURT FOR THE WESTERN DISTRICT OF MISSOURI,
CENTRAL DIVISION
District Court No. 06-4146-CV-C-NKL
_____

**AMICUS CURIAE BRIEF
OF THE NATIONAL COUNCIL OF CHAIN RESTAURANTS
IN SUPPORT OF APPELLANT APPLEBEE'S INTERNATIONAL, INC.**
_____

Lisa S. Blatt
Robert A. Schwartz
Rachel L. Frankel
ARNOLD & PORTER LLP
555 Twelfth Street, N.W.
Washington, DC 20004
202.942.5000

*Attorneys for Amicus Curiae
National Council of Chain Restaurants*

# TABLE OF CONTENTS

TABLE OF CONTENTS.......................................................................... i

TABLE OF AUTHORITIES.............................................................. ii

I.      IDENTITY AND INTEREST OF AMICUS CURIAE AND
        AUTHORITY TO FILE............................................................ 1

II.     STATEMENT OF ISSUE........................................................ 2

III.    ARGUMENT ............................................................................. 6

        A.      A Duty-Based Standard Conflicts with the Act's Text ................... 7

        B.      The District Court's Decision Is Unworkable and Unjustifiably
                Burdensome.................................................................... 12

IV.     CONCLUSION ....................................................................... 18

Appellate Case: 10-1725    Page: 2     Date Filed: 06/18/2010 Entry ID: 3676334

# TABLE OF AUTHORITIES

**Cases**

*Chandris, Inc. v. Latsis*, 515 U.S. 347 (1995) ...........................................14, 15, 16

*F.D.I.C. v. Meyer*, 510 U.S. 471 (1994) ................................................................. 8

*Jefferson City v. Cingular Wireless LLC*, 531 F.3d 595 (8th Cir. 2008) ................. 8

*Pellon v. Business Representation Int'l, Inc.*, 528 F. Supp. 2d 1306
  (S.D. Fla. 2007), *aff'd*, 291 Fed. Appx. 310 (11th Cir. 2008).......................14, 18

**Statutes**

29 U.S.C. § 203 ...........................................................................................2, 3, 4, 8

29 U.S.C. § 206 ........................................................................................................ 2

**Regulations**

29 C.F.R. § 516.18 ................................................................................................. 17

29 C.F.R. § 531.56.............................................................................................3, 4, 9, 10

29 C.F.R. § 785.13................................................................................................. 17

**Other Authorities**

Dep't of Labor, Wage & Hour Div., *Field Operations Handbook*,
  *available at*  http://www.dol.gov/whd/foh/index.htm...............................5, 10, 11

*Random House Webster's Unabridged Dictionary* (2d ed. 2001).......................... 8

Appellate Case: 10-1725     Page: 3     Date Filed: 06/18/2010 Entry ID: 3676334

# I. IDENTITY AND INTEREST OF AMICUS CURIAE AND AUTHORITY TO FILE

The National Council of Chain Restaurants ("NCCR") is a division of the National Retail Federation, the world's largest retail trade group. NCCR is the leading trade association representing chain restaurant businesses. Its members include large national chain restaurant brands, most of which consist of local multi-unit operators and franchisees. Together, member companies own and operate more than 50,000 restaurant facilities, and another 70,000 facilities operate under members' trademarks through franchising agreements. Member companies and their franchisees employ more than 2.8 million workers in the United States.

For over 40 years, NCCR has advocated sound public policy on behalf of chain restaurant operators. To that end, NCCR regularly takes particular interest in cases that could adversely impact the business operations of its members. NCCR has a significant interest in urging this Court to reverse the decision below.

The district court's decision erroneously departs from the text of the Fair Labor Standards Act (the "Act" or "FLSA") and its implementing regulations, and the rule adopted in the decision below would upset settled industry practice that has been followed for decades by the restaurant industry, including NCCR's members. If not promptly corrected, the decision would impose unworkable and unjustifiable new burdens on businesses and would create tremendous uncertainty for employers.

NCCR submits this brief, with the consent of all parties, pursuant to Rule 29(a) of the Federal Rules of Appellate Procedure.

## II.  STATEMENT OF ISSUE

a.    The FLSA requires covered employers to pay their employees a minimum wage of $7.25 per hour of work.  29 U.S.C. § 206 (a)(1)(C).  In calculating that wage for a "tipped employee," the Act contains a "tip credit" provision that permits an employer to count the employee's tips toward satisfaction of the minimum wage.  *Id.* § 203(m).  The Act defines "tipped employee" as "any employee engaged in an occupation in which he customarily and regularly receives more than $30 a month in tips."  *Id.* § 203(t).  Thus, through straightforward provisions, Congress has adopted a bright-line rule that designates as a "tipped employee" any employee who earns more than $30 per month in tips in his "occupation."

With respect to the compensation of any tipped employee, the Act provides that "the amount paid such employee by the employee's employer shall be" a base "cash wage" of $2.13 plus any "additional amount" necessary, once tips are included, to equal the minimum wage of $7.25 per hour.  *Id.* § 203(m).  The employer is, therefore, permitted to pay a minimum direct wage of $2.13 per hour, so long as that amount plus the employee's tips equals or exceeds the $7.25 minimum hourly wage; on the other hand, if the employee's tips are insufficient to

2

meet that minimum, the employer must make up the difference by paying additional direct wages so that the employee's total pay equals $7.25 per hour. *Id.* Thus, an employer satisfies the requirements if he pays a waiter $2.13 per hour in direct wages and the waiter earns an average of $5.12 per hour in tips for a combined total of $7.25 per hour. Conversely, if the waiter earns less than $5.12 per hour in tips, the employer must make up the difference so that the sum of the tips and employer contribution equals or exceeds the $7.25 per hour minimum wage.

The Department of Labor has recognized that some "tipped employees" have second "occupations," in which they may not necessarily be "tipped employees." Thus, the Department has promulgated a "dual job[s]" regulation to address those workers' wages. *See* 29 C.F.R. § 531.56(e). The regulation provides that where an employee has a "dual job"—i.e., "two occupations"—and he is a tipped employee in only *one* of those occupations, the tip credit may be used *only* for hours the employee works in the tipped occupation and not for those worked in the other occupation. *Id.* Importantly, however, the regulation provides that a tipped employee does not become a "dual job" holder merely because he performs some duties that are "not by themselves . . . directed toward producing tips." *Id.* Rather, the employee remains a tipped employee, eligible for application of the tip credit, as long as the employee's occupation is one in which "he customarily and

3

regularly receives at least [$30] a month in tips." *Id.*

As an example of a "tipped employee" with "two occupations," the regulation explains that "where a maintenance man in a hotel also serves as a waiter" and receives tips only as a waiter, he is "employed in two occupations, and no tip credit can be taken" "for his hours of employment in his occupation as a maintenance man." *Id.* By contrast, the regulation states, such a "two occupation[]" or "dual job" situation "is distinguishable from that of a waitress who spends part of her time cleaning, and setting tables, toasting bread, making coffee and occasionally washing dishes or glasses." *Id.* The waitress remains in a single "occupation" despite the variety of duties because, as the regulation expressly states, "such related duties . . . need not by themselves be directed toward producing tips" in order for the tip credit to apply. *Id.*

Thus, like the Act itself, the implementing regulation provides that the tip credit applies to all time spent by any "tipped employee" in his "occupation" regardless of the particular duties being performed or the proportion of those duties that relate to, or directly produce, tips from customers. *See* 29 U.S.C. § 203(t); 29 C.F.R. § 531.56(e).

In addition to the formal regulation, the Department of Labor has also published a "Field Operations Handbook" that addresses these issues. *See* Dep't of Labor, Wage & Hour Div., *Field Operations Handbook*, *available at*

4

http://www.dol.gov/whd/foh/index.htm. Unlike the Act and the regulation, however, the Handbook purports to impose quantitative and qualitative limits on the types of duties that a tipped employee may perform in order for the tip credit to apply. Section 30d00(e) of the Handbook states that an employer may not use the tip credit for any time a tipped employee spends on duties that "are not by themselves directed toward producing tips" *if* the employee spends more than 20 percent of his time on those duties. *Id.* § 30d00(e). In conflict with the regulation, the Handbook applies that 20 percent rule even to duties that are "related to the tipped occupation." *Id.* Thus, the Handbook's rule would limit the tip credit provision to work that is "directed toward producing tips" unless the non-qualifying duties account for less than 20 percent of the employee's time spent working.

b. In this class action lawsuit by current and former Applebee's servers and bartenders against the restaurant chain, the district court adopted and upheld the validity of the Handbook's 20-percent rule, reasoning that "Congress intended for the tip credit to be taken when employees are primarily engaged in tip producing duties." J.A. 141. The court accordingly rejected Applebee's argument that the Act focuses on the *occupation* of the employee, not his *duties*, and thus authorizes use of the tip credit for all work performed in that occupation regardless of the duties performed. J.A. 138-39.

5

In reaching its decision, the court expressed the view that the tip-credit provision places a cap on the amount of general maintenance and preparation work an employee can perform as a waiter or bartender, regardless of the amount of monthly tips those employees receive in their jobs. The court stated that "[t]he Department of Labor's twenty percent cushion ensures that employers will not lose the tip credit until they assign substantial work that is not tip producing, i.e. general preparation and maintenance instead of work directed to specific customers, the source of all tips." J.A. 143. The court opined that "a reasonable limit had to be placed on the amount of work that could be assigned that was not customer specific." J.A. 144. It then criticized Applebee's position for leading to the conclusion that an employer could assign its waiters and bartenders an unlimited amount of "non-tipped duties," including "cleaning the bathrooms." J.A. 145. The court remarked that "[t]here is no reasonable argument that cleaning bathrooms is related to occupations where food and beverages are handled even if both the bathroom and the food promote a customer's enjoyment of the restaurant." J.A. 145 n. 7; *accord id.* at 146 (stating that a "server performing purely janitorial duties like cleaning bathrooms" is performing "work unrelated to their tipped occupation").

## III.  ARGUMENT

The district court seriously erred in construing the Act's tip credit provision

6

to impose a 20-percent limit on duties that are not themselves specifically directed toward producing tips from particular customers. Contrary to the district court's holding, the Act expressly conditions use of the tip credit on whether a given worker earns more than $30 per month in tips, and it imposes no limitation on the nature of the duties that may be assigned to that "tipped employee" within a single "occupation." The "dual job" regulation reinforces those rules. The 20-percent limitation imposed by the district court thus contradicts both the statutory text and the explicit regulation, and, as explained below, would create unworkable and unjustifiable burdens on employers, none of which were intended by Congress.

A.     **A Duty-Based Standard Conflicts with the Act's Text.**

1. The district court erroneously held that an employer's use of the tip credit is prohibited where an employee spends more than 20 percent of his time doing work that is not directed at generating tips from "specific customers." J.A. 141, 143. In the district court's view, those requirements were justified because "Congress said that the employee's work must be within the 'tipped occupation'," and thus "Congress intended for the tip credit to be taken when employees are primarily engaged in tip producing duties." J.A. 141. This analysis is flawed in several respects.

First, the FLSA does not contain the phrase "tipped occupation." Instead, the statute uses the term "tipped employee," which is then defined with respect to

7

the employee's "occupation," not with respect to his duties. In plain language, the Act extends the tip credit to "*any employee* engaged in an *occupation* in which he customarily and regularly receives more than $30 a month in tips," 29 U.S.C. § 203(t) (emphases added), stating that such an employee's minimum hourly wage "shall be" calculated using the tip credit, *id*. § 203(m). As a result, so long as the monetary threshold is met, the tip credit applies. The Act does *not* require an employee to perform only tip-producing work or work directed at producing tips from specific customers, much less does it impose a cap on other duties at 20 percent of the employee's time. Indeed, nothing in the Act speaks to the type of work that the "tipped employee" may perform—rather, the Act refers only to the employee's "occupation" and requires that the employee simply earn more than $30 per month in tips in the course of that "occupation."

The word "occupation" is not defined in the statute or related regulations; accordingly, its ordinary meaning applies. *See F.D.I.C. v. Meyer*, 510 U.S. 471, 476 (1994); *Jefferson City v. Cingular Wireless LLC*, 531 F.3d 595, 606 (8th Cir. 2008). "Occupation" means "a person's usual or principal work or business, [especially] as a means of earning a living." *Random House Webster's Unabridged Dictionary* 1339 (2d ed. 2001). *Webster's* gives the following illustration: "*Her occupation was dentistry.*" *Id.* In common usage, a dentist is engaged in a single "occupation" whether she is filling cavities, advising patients

8

on oral hygiene, cleaning the room between patients, making appointments, or paying the rent on her office—even though those tasks might otherwise be performed by a dental hygienist, receptionist, or office manager. In the same way, a waiter or bartender is engaged in a single "occupation," notwithstanding that he or she may perform duties besides those that directly produce tips from specific customers.

2. The tip credit provision therefore applies to any waiter or bartender who regularly receives more than $30 a month in tips and is therefore a "tipped employee" under the Act. The Act does not permit a tipped employee, such as a bartender, to evade that status simply by claiming that he or she performs certain duties that cannot be shown to produce a tip directly. The dispositive fact is that he or she is a bartender who receives sufficient tips, and as long as the work performed is reasonably within the occupation of a bartender, the work's relationship to the procurement of a specific tip is irrelevant.

That conclusion is confirmed by the Department's dual job regulation. *See* 29 C.F.R. § 531.56(e). A person who is both a "waiter" and a "maintenance man" at a hotel has two "occupations." This accords with the plain meaning of "occupation." On the other hand, a waitress is in one "occupation"—waitress— even though she spends "part of her time cleaning, and setting tables, toasting bread, making coffee and occasionally washing dishes or glasses." *Id*. This too

9

conforms to the plain meaning of "occupation." Thus, the regulation is consistent with the statute in expressly permitting the tip credit to be used for *all of the waitress's time*, assuming that she earns $30 monthly in tips. *Id.* The regulation explains that "[s]uch related duties in an occupation that is a tipped occupation need not by themselves be directed at producing tips." *Id.* That language makes clear that the employee maintains her occupational status as a waitress as long as the duties she performs relate to her being *a waitress.*

The district court here appears to have attempted to harmonize the 20-percent rule with the dual job regulation by reasoning that "defining an occupation at its margins is difficult" and that the Department, in the Handbook, could reasonably have construed the Act to place the 20-percent cap on non-tip-generating duties. J.A. 142; *accord id.* at 147-148. But neither the Act nor the regulation gives any weight to an employee's duties, nor does either purport to tell an employer how to assign work to its employees. Although an employee's general duties are relevant to defining an employee's occupation, whether those duties produce tips or are related to producing tips is entirely irrelevant. Again, the tip credit provision is triggered by the dollar amount of tips received, not by how much work is devoted to producing those tips. This approach is sensible inasmuch as it conditions the tip credit on the employee's earnings.

The district court's rule, by contrast, leads to absurd results. For example,

10

under the district court's approach, a bartender earning $1000 per month in tips may be deemed to have two occupations, and thus be entitled to additional wages from his employer, simply because he spends 21 percent of his time doing general cleaning or preparation work. Meanwhile, another bartender who earns only $31 a month in tips would remain a tipped employee at all times, entitled only to the tipped employee wage, if he should happen to spend only 19 percent of his time doing purportedly non-tip-producing work. Congress could not have intended such anomalous and arbitrary results.

3. The district court thus distorted the plain meaning of the regulation when it adopted the Handbook, which contradicts the regulation by focusing on the relationship between an employee's duties and his tips instead of the statutory focus on the employee's occupation itself and the compensation received. For instance, the court rejected out of hand the notion that "cleaning bathrooms is related to the occupation of servers and bartenders" because, in its view, "[t]here is no reasonable argument that cleaning bathrooms is related to occupations where food and beverages are handled even if both the bathroom and the food promote a customer's enjoyment of the restaurant." J.A. 145 & n.7; *see also id.* at 137-38 (reasoning that the tip credit should not apply to work "to clean bathrooms during their shifts, to sweep the restaurant, to clean and stock service areas, roll silverware, and to do other duties not directed to specific customers"). But a

Appellate Case: 10-1725    Page: 14    Date Filed: 06/18/2010 Entry ID: 3676334

bartender or server remains a bartender or server—i.e., in a single "occupation"—even when performing unpleasant duties. A flight attendant does not cease to be a flight attendant when he cleans a lavatory, just as a dentist does not stop being a dentist if he handles medical waste, and a hair dresser remains a hair dresser even while sweeping the floor after a haircut. In the same way, anyone who has been in a restaurant has likely observed a waiter or bartender cleaning up or rolling silverware; such tasks are inherent in those "occupations."

It should be underscored that, under the Act, an employer has a strong incentive to assign a tipped employee to do mostly tip-producing work: Regardless of the amount in tips a tipped employee performs, the FLSA guarantees a minimum wage of $7.25 per hour. When the employee earns more in tips, the employer's required contribution to the $7.25 per hour minimum is reduced, subject to the minimum of $2.13 per hour in direct pay. The district court's policy arguments not only conflict with the Act itself—they are also unfounded.

## B. The District Court's Decision Is Unworkable and Unjustifiably Burdensome.

The restaurant industry is extremely competitive, and most operators have narrow profit margins. Servers and bartenders generally have been paid at "tipped employee" rates for over 40 years. Restaurant operators can establish menu prices only in light of those labor costs and other expenses. The tip credit allows

12

employers to hold down prices while ensuring that tipped employees receive the minimum wage through a combination of wages and tips.

Apart from the district court here, no court has held that the tip credit is limited by the percentage of an employee's time that is devoted or related to tip-producing or customer-specific tasks. Not surprisingly, because the Act's tip credit provision focuses on the employee's occupation and not his duties, the Act does not define what work is "tip producing." Indeed, any such definition would be elusive and arbitrary.

The district court's duty-based standard would require the categorization and identification of duties that are purportedly directed at producing tips from specific customers and of duties that relate to such tip-producing activities. That requirement would radically alter industry practice, generate confusion, and impose both costly burdens and unquantifiable litigation risks upon employers that already are facing low profit margins in a highly competitive market.

1. Any standard that turns on whether a task is "tip producing" is unclear, at odds with the reality of the restaurant industry, and is significantly likely to lead to inconsistent and unpredictable results from case to case. For instance, consider a waiter's duty to set a table before a customer sits down. It is far from clear whether that duty is tip-producing or, rather, simply related to the waiter's tip-producing duty and therefore subject to the district court's 20-percent cap.

Appellate Case: 10-1725    Page: 16    Date Filed: 06/18/2010 Entry ID: 3676334

Similarly, questions with no clear answers would arise if a waiter were to respond to a dropped spoon or a spilled beverage, especially if the accident occurred at a table being waiting on by a different employee. Or, if a restaurant were to ask its waiters at the close of business to wipe down tables and sweep the floor (an extremely common practice in the restaurant industry), the court's standard would call into question how waiters should be paid for such cleaning duties.

The same questions would arise in the case of a bartender who cleans up a patron's drink spilled down the length of the bar as the patron heads for a table to eat. At a minimum, because an employee may argue that the duty was not customer-specific, the restaurant operator would be required to keep records of the time spent cleaning up the spill. As another district court aptly has observed, the line-drawing involved under such an approach is "infeasible" and would create "unsolvable" problems. *Pellon v. Business Representation Int'l, Inc.*, 528 F. Supp. 2d 1306, 1312-14 (S.D. Fla. 2007), *aff'd*, 291 Fed. Appx. 310 (11th Cir. 2008). These judgments are clearly not what Congress intended when it delineated the tip credit by reference to "occupation."

In an analogous employment context, the Supreme Court rejected an interpretation of an Act of Congress that would cause an employee's status to change throughout his workday depending on the tasks performed. In *Chandris, Inc. v. Latsis*, 515 U.S. 347 (1995), the Court held that an employee is a "seaman"

14

and thus covered by the Jones Act if the employee has a sufficient connection with a vessel; the employee "does not lose that" occupational status when he happens to be working "off the ship." *Id*. at 359-60. Likewise, the Court explained, "[l]and-based maritime workers do not become seamen because they happen to be working on board a vessel." *Id*. at 361.

The Court reasoned that it is "important to avoid engrafting upon the statutory classification . . . a judicial gloss so protean, elusive or arbitrary as to permit a worker to walk into and out of coverage in the course of his regular duties." *Id*. at 363. The Court emphasized that a worker should not be deemed to "oscillate back and forth . . . *depending upon the activity*." *Id*. (emphasis added). Any such activity-based standard, the Court explained, was contrary to "the interests of employers and maritime workers alike in being able to predict who will be covered by" the statute "before a particular workday begins." *Id*.

This Court should similarly reject the district court's erroneous task-based standard, among other reasons, because it would create the precise practical problems the Supreme Court sought to avoid in *Chandris*. Under the district court's rule, the tipped employees of any given restaurant would "walk into and out of coverage" many times throughout their shifts. *See id*. As a result, rather than determining the applicability of the Act's tip-credit provision "before a particular workday begins," *see id.*, restaurant operators and their employees would

15

have to track every task performed throughout a shift, categorize each as "tip-generating" or "non-tip-generating" and as "customer-specific" or "non-customer-specific," and determine payroll retrospectively. J.A. 141, 143. The Court in *Chandris* directed that "courts should not employ a 'snapshot' test for [employment] status, inspecting only the situation as it exists at the instant of [alleged] injury; a more enduring relationship is contemplated in the jurisprudence." *Chandris*, 515 U.S. at 363 (internal citation omitted). There is no reason for a different approach under the FLSA.

2.    Moreover, because the line-drawing required by a duty-based approach inevitably would give rise to differences of opinion, restaurant operators would be left to speculate about how some future court or jury might decide which tasks were tip producing and which were directed to a specific customer. The district court stated that "what duties comprise the occupation of a server or bartender" is a question of law, J.A. 139 n.3, but it left open the question of whether a court or a jury should decide whether a given *duty* is tip-producing—i.e., "work directed to specific customers," *id*. at 143 n.5. The plaintiffs, however, view this as a question of fact for the jury. *See* Pl.'s Br. in Response to the Statement of Issues (Doc. # 301) (July 17, 2009) at 12.

In sum, the district court's standard would expose employers to conflicting judgments and unpredictable standards from case to case. Under the resulting

Appellate Case: 10-1725     Page: 19     Date Filed: 06/18/2010 Entry ID: 3676334

system, restaurant operators would have no reliable way to ensure their compliance with the Act or to assess their potential liability.

3.  The district court held that once an employee makes a *prima facie* showing of liability, the employer must produce "records as to the precise amount of time [a tipped employee] spent on specific duties," or the burden shifts to the employer to *disprove* the allegation that the employee spent 20 percent or more of his or her time on non-tip-generating or non-customer-specific tasks.  J.A. 141, 143.  Resting on an erroneous interpretation of the statute and regulation, this rule would impose incredible new burdens on the industry.  Employers simply do not keep, nor are they required to keep, records that track and classify the potentially infinite variety of tasks that a tipped employee performs throughout a shift.[1]

Only costly and ineffective options could enable an employer to attempt compliance with such a requirement.  One option would be for tipped employees to classify and record their own time spent on each task.  Servers, however, are constantly on the move from location to location, from task to task, and from customer to customer.  Self-monitoring would require employees either to make quick judgments about how to classify tasks or to record their time with less precision after the fact.  Either way, accuracy would be difficult or impossible to

---

[1]  The regulations cited in the district court's decision (J.A. 147) are inapposite. 29 C.F.R. § 785.13 (employer must pay for work performed even if not requested); 29 C.F.R. § 516.18 (record requirements for farm employers).

Appellate Case: 10-1725     Page: 20     Date Filed: 06/18/2010 Entry ID: 3676334

monitor and enforce, and customer service would suffer.

Alternatively, restaurants could employ additional staff to monitor the tipped employees—an expensive and intrusive solution that has no precedent in the industry. *Pellon*, 528 F. Supp. 2d at 1314 ("[N]early every person . . . could claim a cause of action . . . if the employer did not keep the employee under perpetual surveillance or require them to maintain precise time logs accounting for every minute to their shifts . . . ."). The costs of compliance would likely be passed to consumers, and the viability of businesses would be endangered. The consequences would be particularly severe for operators with small profit margins, who, in difficult economic times, have come to rely on the tip credit to stay in business.

## IV.   CONCLUSION

The rule imposed by the district court has no basis in the statute, regulations, or industry practice, and it would be unworkable in application. The economics of the industry depend to a significant extent upon the justifiable expectation that courts will follow the plain meaning of the FLSA. This Court should therefore reverse the erroneous decision of the district court.

Appellate Case: 10-1725     Page: 21     Date Filed: 06/18/2010 Entry ID: 3676334

DATED this 17th day of June, 2010

Respectfully submitted,

  /s/ Lisa S. Blatt                          
Lisa S. Blatt
Robert A. Schwartz
Rachel L. Frankel
ARNOLD & PORTER LLP
555 Twelfth Street, N.W.
Washington, DC 20004
202.942.5000

*Attorneys for Amicus Curiae*
*National Council of Chain Restaurants*

19

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. Proc. 32(a)(7)(B) because the brief contains 4,345 words, excluding the parts of the brief exempted by Fed. R. App. Proc. 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Fed. R. App. Proc. 32(a)(5) and the type style requirements of Fed. R. App. Proc. 32(a)(6) because this brief has been prepared in a proportionately spaced typeface using Microsoft Word 2007 in Times New Roman 14-point font.

 /s/ Lisa S. Blatt
Lisa S. Blatt

*Attorney for Amicus Curiae*
*National Council of Chain Restaurants*

# PROOF OF SERVICE

I hereby certify that I filed ten paper copies and one digital version of this brief with the Court on June 17, 2010, by Federal Express postage prepaid, and, on the same date, caused two paper copies and one digital copy to be served by first-class U.S. Mail on counsel for each party at the following addresses:

Daniel B. Boatright
S. Jane Bruer
LITTLER MENDELSON, P.C.
2300 Main Street, Suite 900
Kansas City, MO 64108
816.627.4400

*Attorneys for Petitioner*

Matthew A. Clement
Timothy W. VanRonzelen
Kari A. Schulte
Cook, Vetter, Doerhoff & Landwehr, P.C.
231 Madison
Jefferson City, MO 65101

Charles A. Gentry
Jason H. Ludwig
Carson & Coil
515 East High Street
P.O. Box 28
Jefferson City, MO 65102

*Attorneys for Respondent*

_____June 17, 2010_____
Date

_/s/ Robert A. Schwartz_____
Robert A. Schwartz
*Attorney for Amicus Curiae*